UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID YURKOVICH,<br><br>                     Plaintiff,<br><br>     -against-<br><br>CHIASMA, INC., RAJ KANNAN, DAVID STACK, SCOTT MINICK, JOHN F. THERO, RONI MAMLUK, JOHN A. SCARLETT, TODD FOLEY, and BARD GEESAMAN<br><br>                  Defendants. | CASE NO.: _____ |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff David Yurkovich ("Plaintiff"), on behalf of himself, by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.     This is an action brought by Plaintiff against Chiasma, Inc., ("Chiasma" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Chiasma, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed merger of Amryt Pharma plc ("Amryt") with Chiasma.

2.     On May 4, 2021, Amryt and Chiasma entered into an Agreement and Plan of

Merger (the "Merger Agreement"), providing for Amryt's acquisition of Chiasma, pursuant to a merger between Chiasma and Amryt, with Amryt as the surviving entity (the "Proposed Transaction"). Pursuant to the terms of the Merger Agreement, Chiasma stockholders will receive 0.396 Amryt American Depositary Shares ("ADSs"), each representing five Amryt ordinary shares, for each share of Chiasma common stock issued and outstanding prior Proposed Transaction ("Merger Consideration").

3.      On Juen14, 2021, in order to convince Chiasma's public common stockholders to vote in favor of the Proposed Transaction, Defendants, together with Amryt took a step forward and authorized the filing of a materially incomplete and misleading Joint Form F-4 Registration Statement/Proxy (the "Registration Statement") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act, seeking Chiasma stockholder approval of the Proposed Transaction.

4.      In particular, the Registration Statement contains materially incomplete and misleading information concerning: (i) financial projections for Chiasma and Amryt; and (ii) the key inputs for the financial analyses performed by Duff & Phelps ("Duff & Phelps"), and to support their fairness opinions.

5.      The Proposed Transaction is expected to close early in the third quarter of 2021 and the special meeting of the Company's stockholders to vote on the Proposed Transaction can be scheduled at any time. It is therefore imperative that the material information that has been omitted from the Registration Statement is disclosed prior to the special meeting of Chiasma stockholders so Plaintiff can properly exercise his corporate voting rights.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed

Transaction unless and until the material information discussed below is disclosed to Plaintiff and Chiasma's public common stockholders sufficiently in advance of the special meeting of the Company's stockholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Indeed, Chiasma's common stock is listed and traded on the Nasdaq Global Select Market ("NASDAQ"), which is also headquartered in this District.

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the holder of Chiasma common stock.

12.     Defendant Chiasma is a Delaware corporation that maintains its principal place of business at 140 Kendrick Street, Building C East, Needham, MA.  Chiasma's common shares are traded on the NASDAQ under the ticker symbol "CHMA."

13.     Individual Defendant Raj Kannan has been a member of the Board of Directors and Chief Executive Officer since June 17, 2019 and was appointed President in January 2021.

14.     Individual Defendant David Stack has been a member of the Board of Directors and Chairman of the Board since November 2014.

15.     Individual Defendant Scott Minick has been a member of the Board of Directors since October 2007.

16.     Individual Defendant John F. Thero has been a member of the Board of Directors since November 2015.

17.     Individual Defendant Roni Mamluk has been a member of the Board of Directors since June 2017

18.     Individual Defendant John A. Scarlett has been a member of the Board of Directors since February 2015.

19.     Individual Defendant Todd Foley has been a member of the Board of Directors since May 2008.

20.     Individual Defendant Bard Geesaman. has been a member of the Board of Directors since 2004

21.     The defendants identified in paragraphs 13 through 20 are collectively referred to

herein as the "Individual Defendants" or the "Board."  The Individual Defendants together with Chiasma, are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**I.      Background of the Company and the Proposed Transaction**

22.      Chiasma is a commercial-stage biopharmaceutical company focused on improving the lives of patients who face challenges associated with existing treatments for rare and serious chronic disease. The Company employs its proprietary Transient Permeability Enhancer, or TPE®, technology platform, to develop oral medications that are currently available only as injections. In June 2020, the U.S. Food and Drug Administration, or the FDA, approved MYCAPSSA® (octreotide capsules) for long-term maintenance treatment in acromegaly patients who have responded to and tolerated treatment with octreotide or lanreotide.  Chiasma commenced the U.S. commercial launch of MYCAPSSA in September 2020.  MYCAPSSA is the first and only oral somatostatin analog, or SSA, approved by the FDA and the first product approved by the FDA utilizing our TPE technology.  The Company has focused on the commercialization of MYCAPSSA for the treatment of patients with acromegaly in the United States and continuing its development and seeking regulatory approval of MYCAPSSA in the European Union.

23.      Acromegaly is a rare and debilitating condition that results in the body's production of excess growth hormone, or GH, which in turn elevates insulin-like growth factor 1, or IGF-1. These elevated hormone levels result in a number of painful and disfiguring signs and symptoms, including some acute, such as headaches, joint pain and fatigue, and some long-term, such as enlarged hands, feet and internal organs, as well as altered facial features. If not treated promptly, acromegaly can lead to serious illness and is associated with premature death,

primarily due to cardiovascular disease.  Octreotide is an analog of somatostatin, a natural inhibitor of growth hormone secretion. The current standard of care for patients diagnosed with acromegaly and not otherwise cured by surgical removal of the pituitary tumor consists of lifelong, once-monthly injections of an extended release somatostatin analog, primarily octreotide or lanreotide. These products contain a viscous formulation and are typically administered by a healthcare professional with large-gauge needles into the muscle or deep subcutaneously, that is, deeply under the skin. While injectable somatostatin analogs are generally effective at reducing GH and IGF-1 levels and, therefore, providing disease control, the injections are associated with signification limitations and patient burdens, including suboptimal symptom control, especially as the treatment effects begin to wane near the end of the monthly cycle prior to the next injection, inconvenience, pain and other injection-related side effects. With the FDA approval of MYCAPSSA in June 2020, MYCAPSSA became the first somatostatin analog available for oral administration. Octreotide capsules (MYCAPSSA) have been granted orphan designation in the United States and the European Union for the treatment of acromegaly. The Company has estimated the worldwide market for injectable somatostatin analogs is approximately $2.8 billion annually, of which approximately $800 million represents annual sales for the treatment of acromegaly.  Chiasma retains worldwide rights to develop and commercialize octreotide capsules.

24.     On May 4, 2021, Chiasma's Board caused the Company to enter into the Merger Agreement with Amryt.  Pursuant to the terms of the Merger Agreement, each share of Chiasma common stock issued and outstanding prior to the consummation of the Proposed Transaction will be exchanged for 0.396 Amryt ADSs, each representing five Amryt ordinary shares..

25.     On May 5, 2021 Chiasma and Amryt issued joint a press release announcing the

Proposed Transaction, which stated in relevant part:

### Amryt Pharma to Acquire Chiasma, Inc. to Further Strengthen Global Leadership in Rare and Orphan Diseases

*- Combined business will have three approved commercial products, lomitapide (Lojuxta®/Juxtapid®), metreleptin (Myalept®/ Myalepta®), octreotide (MYCAPSSA®) and a robust clinical pipeline*

*- Lead pipeline product Oleogel-S10\*(Filsuvez®) under regulatory review in the US and EU*

*- Deal expected to pave a path to a combined potential $1BN peak revenue for Amryt*

*- The acquisition is expected to deliver estimated annual cost synergies of approximately $50M and be revenue and EBITDA accretive and cash generative in the first full calendar year of combined operations and substantially accretive thereafter*

*- MYCAPSSA® is the first and only oral somatostatin analog ("SSA") approved for appropriate patients with acromegaly in a global market estimated at approximately $800M with the potential to expand into the neuroendocrine tumor ("NET") market estimated at approximately $1.9BN globally and has a confirmed modified 505(b)(2) regulatory pathway in the US*

*- Acquisition leverages Amryt's proven commercial execution ability, global infrastructure and integration capabilities to accelerate MYCAPSSA® launch in the US and international markets*

*- All stock transaction with Amryt shareholders to own approximately 60% and Chiasma shareholders approximately 40% of the combined entity with voting agreements received from lead shareholders of both businesses—Athyrium Capital Management LP, Highbridge Capital Management and MPM Capital*

\* \* \*

**DUBLIN, Ireland, and Boston MA, May 5, 2021**, Amryt (Nasdaq: AMYT, AIM: AMYT), a global, commercial-stage biopharmaceutical company dedicated to acquiring, developing and commercializing novel treatments for rare diseases, today announces that it has signed a definitive agreement to acquire Chiasma, Inc. (Nasdaq: CHMA) in an all-stock combination. The combined company will be a global leader in rare and orphan diseases with three on-market commercial products, a global commercial and operational footprint and a significant development pipeline of therapies with the financial flexibility to execute its

growth plans. The transaction has been approved and recommended by the Boards of both Amryt and Chiasma.

Under the terms of the transaction, each share of Chiasma common stock issued and outstanding prior to the consummation of the transaction will be exchanged for 0.396 Amryt American Depositary Shares ("ADSs"), each representing five Amryt ordinary shares. As of the close of trading on May 4, 2021 Amryt's ordinary shares on AIM were £2.00 ($2.78) per share and Amryt's ADS's on Nasdaq were $12.95 (£9.31) per ADS.

Amryt already has in place the infrastructure, expertise and the financial flexibility to realize the full potential of MYCAPSSA® globally and further develop life-cycle management opportunities to expand the benefits of MYCAPSSA® to other patient populations including NET. The transaction is expected to accelerate and diversify Amryt's growing revenues and Amryt expects to deliver estimated annual cost synergies of approximately $50M.

**Dr. Joe Wiley, Chief Executive Officer of Amryt, commented**: "We are really excited by today's news and are looking forward to welcoming the Chiasma team to Amryt. Amryt has grown significantly in the past six years and our success to date is due to the phenomenal commitment and drive of the Amryt team. This transaction brings together two teams that have a strong track record of execution and passion for developing therapies that can help improve the lives of patients in need. The addition of MYCAPSSA®, which was recently launched in the US, to our commercial product portfolio represents a strong strategic, operational and commercial fit given the significant call-point overlap that exists across our portfolio.

This deal further solidifies our position as a global leader in treating rare and orphan conditions. The combined business will have three approved commercial products and an exciting pipeline of development assets. Our lead development candidate, Oleogel-S10, is currently progressing through the regulatory process in the US and EU and, if approved, will bring our portfolio of commercial products to four. We see significant revenue growth opportunities for MYCAPSSA® in acromegaly and are also very excited to further develop the potential for MYCAPSSA® in patients with carcinoid symptoms stemming from NET where we believe the commercial opportunity is significant. With the addition of NET, our combined pipeline will have four product candidates in late clinical stages as well as our exciting pre-clinical gene therapy asset, AP103 in dystrophic Epidermolysis Bullosa ("EB").

The proposed transaction will leverage our track record of successful integration and significantly enhance our future growth plans in highly attractive markets globally. With this transaction, we believe that we can continue the strong growth trajectory already underway at Amryt and have the financial strength to execute our future growth plans."

**Raj Kannan, Chief Executive Officer of Chiasma commented**: "I am incredibly proud of what the team at Chiasma has been able to accomplish and we look forward to joining Amryt in continuing to focus on making the lives of patients with rare diseases better. The merger with Amryt allows the combined company to significantly leverage the operational efficiencies in successfully commercializing MYCAPSSA® globally and expand the potential benefits of MYCAPSSA® to other patients with unmet needs. The combined business has significant potential to further enhance shareholder value with a diversified portfolio of both marketed products and a meaningful late-stage pipeline that could potentially drive future growth opportunities. I am confident that this combination with Amryt, given their track record of success, positions us well to deliver long-term value for our patients and for our shareholders."

**Transaction Benefits**

**A leading orphan and rare disease company with a diversified portfolio of established and growing products and financial strength**—Consistent with Amryt's shareholder endorsed strategy to acquire, develop and commercialize novel treatments for rare diseases, the combined portfolio of products offers a pathway to a potential $1BN of peak revenues. Amryt has a proven track record of successful integration and expects to deliver approximately $50M in cost synergies per annum. Both Amryt and Chiasma currently enjoy a significant degree of customer call-point overlap and combining operations will provide significant salesforce scale opportunities. In the endocrinology space, both Myalept®/Myalepta® and MYCAPSSA® are growth assets and by combining and scaling salesforces, Amryt believes that this will not only drive MYCAPSSA® adoption but also enable further Myalept®/Myalepta® revenue growth. The combined business will have three approved commercial products as well as a robust clinical pipeline. Both Oleogel-S10 (if approved) and MYCAPSSA® are first-to-market novel therapies. MYCAPSSA® is the first and only oral SSA approved for appropriate patients with acromegaly and Oleogel-S10 has the potential to be the first approved therapy for EB.

**Delivers improved competitive positioning with increased scale in US, EU and beyond** - The transaction is expected to enhance the combined group's commercial and medical infrastructure globally. Amryt plans to deploy its significant expertise and commercial platforms to further accelerate the launch of MYCAPSSA® in the US and also to seek MYCAPSSA® approval and launch internationally.

**Significant market potential for MYCAPSSA® in NET** - Amryt believes MYCAPSSA® is well positioned to address the desire for an oral option in the treatment of carcinoid symptoms associated with NET. Injectable octreotide is already approved and used in the treatment of NET and SSA utilization in NET is expected to account for an estimated $1.3BN in the US and $2.4BN globally by

2028. During the first quarter of 2021, Chiasma submitted an Investigational New Drug ("IND") application for a Phase 1 relative bioavailability study followed by a single Phase 3, randomized, double-blind, placebo-controlled study of MYCAPSSA® in patients with carcinoid syndrome, which are designed to support a modified 505(b)(2) regulatory pathway for marketing approval. Subject to ongoing discussions with the FDA and completion of the Phase 1 study, we plan to commence enrollment to the Phase 3 study as early as H1 2022.

**Cultures, values and expertise aligned** - Amryt and Chiasma share a deep commitment and passion for serving patients by developing and bringing to market innovative therapies. We share a similar business philosophy of placing patients at the center of everything we do and in celebrating inclusion and diversity across our business operations.

**Expected to deliver significant shareholder value** - The acquisition is expected to be revenue and EBITDA accretive and cash generative in the first full calendar year of combined operations and substantially accretive thereafter. Significant value is also expected to be created through the realization of estimated annual cost synergies of approximately $50m. We expect that the transaction will result in a diversified and broad shareholder base with leading biotech investors supportive of the company's long-term growth plans.

\* \* \*

Transaction Overview

- Recommended acquisition of Chiasma by Amryt in an all-stock transaction

- Chiasma shareholders will receive 0.396 Amryt ADSs for each share of Chiasma common stock, subject to rounding for fractional shares. As of the close of trading on May 4, 2021 Amryt's ordinary shares on AIM were £2.00 ($2.78) per share and Amryt's ADS's on Nasdaq were $12.95 (£9.31) per ADS.

- Based on the fixed exchange ratio, Amryt shareholders prior to the transaction will own approximately 60% of Amryt post transaction and Chiasma shareholders prior to the transaction will own approximately 40% of Amryt post transaction.

- Chiasma's existing royalty interest financing agreement expected to be fully repaid on closing delivering a high margin unencumbered asset to Amryt's portfolio

- Transaction is endorsed and supported by voting agreements with lead shareholders—Athyrium Capital Management LP, Highbridge Capital Management and MPM Capital

- Transaction is subject to the approval of Amryt and Chiasma shareholders and other customary closing conditions, including regulatory approvals

- Subject to the satisfaction or waiver of closing conditions, the transaction is expected to close in Q3 2021

**Listing, Governance and Management**

- Amryt is currently listed on Nasdaq (AMYT) and AIM in London (AMYT) and will be the publicly quoted company following closing

- Amryt's global headquarters will remain in Dublin, Ireland and its US headquarters will remain in Boston, Massachusetts

- The Amryt team will continue to be led by Dr Joe Wiley, CEO of Amryt

- Raj Kannan, CEO of Chiasma, is expected to join the Board of Amryt on closing of the transaction, subject to regulatory approval. Chiasma will nominate one additional director to join the Board of Amryt, to be confirmed on closing.

\* \* \*

**Advisors to Chiasma**

Torreya Capital LLC is serving as financial advisor and Goodwin Procter LLP is serving as legal advisor to Chiasma. Chiasma's Board of Directors was provided a fairness opinion by Duff & Phelps.

\* \* \*

II.   **The Registration Statement Omits Material Information**

26.     Then on June 14, 2021, Defendants filed a materially incomplete and misleading Registration Statement with the SEC.  The special meeting of Chiasma stockholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Registration Statement misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection

with the Proposed Transaction.

A.      Materially Misleading Statements and Omissions Regarding Chiasma and Amryt's Financial Projections

27.      The Registration Statement fails to provide material information concerning financial projections by management of Chiasma which were relied upon by the Board in recommending the Proposed Transaction, as well as Duff & Phelps in its financial analysis to issue its fairness opinion. The Registration Statement discloses these management-prepared financial projections which are materially misleading. The Registration Statement states that Chiasma management prepared "Unadjusted Chiasma Projections," "Revised Unadjusted Chiasma Projections," and "Adjusted Chiasma Projections." The Registration Statement also discloses financial projections for Amryt for the calendar years 2021 through 2030 based on information provided by Amryt management and then adjusted by Chiasma management, referred to o as the "Chiasma Management Adjusted Amryt Projections." These non-public financial projections were provided to the Board to support its recommendation of the Proposed Transactions, and to Duff & Phelps in rendering its fairness opinions with respect to the Proposed Transaction. Accordingly, the Registration Statement should have, but fails to provide, certain information in the projections that Chiasma and Amryt management provided to the Board and the financial advisors. Registration Statement pages 80-85.

28.      For the Unadjusted Chiasma Projections, the Registration Statement provides values for non-GAAP financial metrics: (i) for fiscal years 2021 through 2025 US Acromegaly MYCAPSSA Non-Risk Adjusted Projections of Revenue for fiscal years 2021 through 2025, as adjusted for Covid in 2021, and plan and conservative scenarios for 2022 through 2025; (ii) EU Acromegaly MYCAPSSA Non-Risk Adjusted Projections for plan and conservative scenarios for 2022 through 2029; and (iii) US Neuroendocrine Tumors (NET) Non-Risk Adjusted Revenue

for both conservative and unadjusted scenarios for 2025 through 2029. The Registration Statement, however, fails to provide: (i) the line items and assumptions underlying the covid adjustments; (ii) the line items and assumptions underlying the planned scenario for each of the three sets of projections; and (iii) the line items and assumptions underlying the conservative scenario for each of the three sets of projections. Registration Statement 83. The omission of this information renders the projections disclose by Defendants a mis-leading half-truth and thereby a direct violation of Regulation G and consequently Section 14(a).

29. For the Revised Unadjusted Chiasma Projections, the Registration Statement provides US Acro[megaly] Scenario 1and US Acro[megaly] Scenario 2 projections for MYCAPSSA Acromegaly Revenue – US for 2026 through 2030 and for MYCAPSSA NET Revenue – US, MYCAPSSA EU Acromegaly and Total Revenue for 2030. Moreover, the Registration Statement states the "Revised Unadjusted Chiasma Projections reflect input by the Chiasma Board and were directed by the Chiasma Board for use in considering and evaluating the merger." The Registration Statement, however, fails to provide: (i) the line items and assumptions underlying the US Acro Scenario 1; (ii) the line items and assumptions underlying the US Acro Scenario 2; and (iii) the input of the Board and the effect that input had in the projections. Registration Statement page 83. The omission of this information renders the projections disclose by Defendants a mis-leading half-truth and thereby a direct violation of Regulation G and consequently Section 14(a).

30. For the Adjusted Chiasma Projections, the Registration Statement provides values for non-GAAP financial metrics: (i) Total Revenue – Probability Of Success Adjusted; (ii) EBITDA; (iii) EBIT; (iv) Net Operating Profit After Taxes; and (v) and Unlevered Free Cash Flows. The Registration Statement, however, fails to provide: (i) the inputs, assumptions and line

items underlying Total Revenue – Probability Of Success Adjusted; (ii) the line items underlying EBITDA; (iii) the line items underlying EBIT; (iii) the inputs, assumptions and line items underlying Net Operating Profit after Taxes, including the NOL assumptions; (iv) the line items underlying Unlevered Free Cash Flows; and (v) a reconciliation of all non-GAAP to GAAP metrics. Registration Statement pages 83-84.  The omission of this information renders the projections disclose by Defendants a mis-leading half-truth and thereby a direct violation of Regulation G and consequently Section 14(a).

31.     For the Chiasma Management Adjusted Amryt Projections, the Registration Statement provides values for non-GAAP financial metrics: (i) Amryt Probability Of Success Revenue Adjusted; and (ii) EBITDA. The Registration Statement, however, fails to provide: (i) the inputs, assumptions and line items underlying Amryt Probability Of Success Revenue Adjusted; (ii) the line items underlying EBITDA; (iii) a reconciliation of all non-GAAP to GAAP metrics. Registration Statement page 85.  The omission of this information renders the projections disclose by Defendants a mis-leading half-truth and thereby a direct violation of Regulation G and consequently Section 14(a).

32.     When a company discloses non-GAAP financial measures in a Registration Statement that were relied on by a board of directors to recommend that stockholders exercise their corporate voting rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation, whether by a schedule or other understandable method, of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

14

33.     In the present case, Defendants' failure to disclose the line items used to calculate (i) the covid adjustments; (ii) the planned and conservative scenarios scenario for each of the three sets of projections Non-Risk Adjusted Projections of Revenue; (iii) EBITDA for either company; (iv) EBIT for Chiasma; (v) Unlevered Free Cash Flows for Chiasma; or (vi) or to provide the requisite reconciliation of all non-GAAP to GAAP metrics similarly renders the Registration Statement materially misleading.

34.     Investors are concerned, perhaps above all else, with the projections and cash flows of the companies in which they invest.  Under sound corporate finance theory, the market value of a company should be premised on the expected unlevered free cash flows of the corporation.  Accordingly, the question that the Company's shareholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear:  Is the Merger Consideration fair compensation given Chiasma's projected cash flows?  Without the line items underlying Chiasma's unlevered free cash flows the Company's shareholders will not be able to properly assess this critical question and evaluate the fairness of the Merger Consideration.

35.     For this reason, Courts have recognized that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

36.     If a Registration Statement discloses financial projections and valuation information, such projections must be complete and accurate.  The question here is not the duty to speak, but liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated

by the factual basis as then known—but it may not choose half-truths. *See Campbell v. Transgenomic, Inc.*, 916 F.3d 1121, 1124-1125 (8th Cir. 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases). Accordingly, Defendants have disclosed some of the information related to the projections relied upon by Duff & Phelps, but have omitted crucial line items and reconciliations. Thus, Defendants' omission renders the projections disclosed on pages 196-197 of the Registration Statement misleading.

B.   Materially Incomplete and Misleading Disclosures Concerning s' Financial Analyses

37.   With respect to Duff & Phelps's *Chiasma Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the line items used to calculate unlevered free cash flow; (ii) the line items used to calculate EBIT; (iii) the inputs and assumptions used for applying a perpetuity rate of decline for the free cash flow of Chiasma after 2030 of 20.0 percent; (iv) the inputs and assumptions used for applying a weighted average cost of capital ranging from12.0% to 14.0%; and (v) in inputs and assumptions underlying the probability of success adjusted revenue projections. Registration Statement pages 68-69.

38.   With respect to Duff & Phelps's *Combined Company Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the line items used to calculate EBITDA; (ii) the line items used to calculate unlevered free cash flow; (iii) the line items used to calculate EBIT; (iii) the inputs and assumptions used for applying a perpetuity rate of decline of 20.0%; (iv) the inputs and assumptions used for applying a weighted average cost of capital ranging from10.50% 12.50%; and (v) in inputs and assumptions underlying the probability of success adjusted revenue projections. Registration Statement pages 72-73.

39.   With respect to Duff & Phelps *Historical Premium Analysis*, the Registration Statement fails to disclose: (i) the transactions observed by Duff & Phelps in the analysis; and

(ii) the premiums for those transactions observed.  Registration Statement page 77.

40.     These key inputs to Duff & Phelps's analysis of both Chiasma and the Combined Company are material to Chiasma shareholders, and their omission renders the summary of Duff & Phelps's Discounted Cash Flow Analysis incomplete and misleading.  As one highly-respected law professor explained regarding these crucial inputs, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."  Steven M. Davidoff, Fairness Opinions, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…"  *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.  This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices***. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78 (emphasis added).  Without the above-mentioned information, Chiasma's shareholders cannot evaluate for themselves the reliability of Duff & Phelps's Discounted Cash Flow Analysis, make a meaningful determination of whether the implied equity value ranges reflect the true value of the Company or was the result of an unreasonable judgment by Duff & Phelps, and make an informed decision regarding whether to vote in favor of the Proposed Transaction.

41.     With respect to Morgan Stanley's *Precedent Premia Analysis*, the Registration Statement fails to disclose: (i) the transactions observed by Morgan Stanley in the analysis; (ii) the premiums for those transactions observed; and (iii) the basis for selecting a reference premium range of 10% to 30%.

42.     In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote their shares in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## <u>COUNT I</u>

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

43.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

44.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

45.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

46.     The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

47.     Defendants have issued the Registration Statement with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction.   Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding, amongst other things: (i) financial projections for Chiasma and Amryt prepared by Chiasma management; and (ii) the key inputs for the financial analyses performed by Duff & Phelps in support of its fairness opinion.

48.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).   The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's common stockholders although they could have done so without extraordinary effort.

49.     The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most

if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that the Board and Chiasma's management all reviewed and assessed financial projections for Chiasma and Amryt, and further states that the Board considered the fairness opinion provided by Duff & Phelps and the assumptions made and matters considered in connection therewith, which included financial projections for Chiasma and Amryt. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

50.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement.  The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

51.     Chiasma is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

52.     The misrepresentations and omissions in the Registration Statement are material to

Plaintiff, who will be deprived of her right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the special meeting of the Company's stockholders. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

53.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

54.     The Individual Defendants acted as controlling persons of Chiasma within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Chiasma, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

55.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

56.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had

the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

57.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

58.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

60.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and/or permanently enjoining Defendants and their counsel, agents, employees, and all persons acting under, in concert with, or for them, from proceeding with,

consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Registration Statement;

       B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

       C.      Directing the Defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

       D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

       E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  June 23, 2021

**MONTEVERDE & ASSOCIATES PC**

  */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*